UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARCUS PICKETT, | Civil Action No.: 2:20-cv-6389 |
| Plaintiff, | **Complaint** |
| v. | **Jury Trial Demanded** |
| LYFT INC., | |
| Defendant. | |

## COMPLAINT

Plaintiff, Marcus Pickett ("Mr. Pickett"), files this Complaint against Lyft, Inc. ("Lyft" or "Defendant"), and in support thereof alleges the following:

**I.     INTRODUCTION**

1. In 2016, Mr. Pickett created a concept to transform how Lyft promoted and increased its ridesharing business and engaged with and helped communities in need.

2. Mr. Pickett's ideas included that Lyft should combine and broaden the different existing ad hoc Lyft programs designed to help different communities, implement other ideas he had for programs, and combine them all into a single initiative that Mr. Pickett named "LyftUp"

3. Mr. Pickett felt that if Lyft unified its initiatives under a single brand, Lyft would have a greater capacity not only to do good, but also to strengthen and expand its ridesharing business.

4. Mr. Pickett's ideas also included potential partnerships with musicians and other celebrities to promote the program.

5. Beginning in 2016, Mr. Pickett approached Lyft executives and offered to present his ideas to them, if Lyft agreed: (a) to keep Mr. Pickett's ideas confidential; (b) that Lyft would

not use Mr. Pickett's ideas without his consent; and (c) that if Lyft wanted to use Mr. Pickett's ideas, including the proposed name, Lyft could not do so without entering into an agreement to compensate Mr. Pickett.

6. The Lyft executives agreed: (a) that Lyft would keep Mr. Pickett's ideas confidential, (b) that Lyft would not use Mr. Pickett's ideas without his consent; and (c) that if Lyft wanted to use Mr. Pickett's ideas, or the proposed name, Lyft could not do so without an agreement to compensate Mr. Pickett.

7. Without those representations by Lyft, Mr. Pickett would not have shared his ideas for the LyftUp initiative.

8. Justifiably relying on these representations by Lyft, Mr. Pickett shared his ideas for the LyftUp concept, along with a proposed logo.

9. At the time Mr. Pickett shared his ideas, he reasonably believed that he had an agreement with Lyft that Lyft would not breach.

10. Once Mr. Pickett revealed his ideas to Lyft, Lyft executives led Mr. Pickett to believe that his ideas were being deliberated on internally, and that someone would contact him about his ideas.

11. In early 2020, Lyft announced to the public that it had launched a new initiative called LyftUp.

12. Mr. Pickett was floored when he learned that Lyft had used his ideas without his knowledge and without compensation.

13. Lyft even used the logo that Mr. Pickett had designed, flip flopping only the two colors used for the words LyftUp in the logo design he had provided Lyft.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1), because the parties are sufficiently diverse and the amount in controversy exceeds $75,000. Plaintiff is a resident of Pennsylvania, while Defendant is a resident of California.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) in that many of the acts alleged herein occurred in substantial part in this District.

## III. PARTIES

16. Plaintiff Marcus Pickett is an individual, entrepreneur, and musician, who resides at 200 Green Lane, Apt. 2, Philadelphia, PA 19127.

17. Lyft is a company incorporated in the State of Delaware, with its headquarters located at 185 Berry Street, Suite 5000, San Francisco, California 94107.

18. Lyft also has an office and employees located in Philadelphia, Pennsylvania.

## IV. THE AMOUNT IN CONTROVERSY EXCEEDS $75,000

19. The amount in controversy is more than $75,000, not counting interest and costs of court, because, among other things, the value of Mr. Pickett's ideas, used without his permission, are in the tens of millions of dollars.

## V. FACTS

### A. MR. PICKETT CONCEIVES OF THE LYFTUP INITIATIVE.

20. During 2016, Mr. Pickett came up with the name and concept for LyftUp.

21. Mr. Pickett conceived creating an initiative, either as part of or as a related entity to Lyft, to coordinate various current and future philanthropic initiatives, such as riders

"rounding up" the costs of rides, or providing a "LyftUp," to provide funds for disaster response or other philanthropic or charitable causes, or to support ride and food access programs.

22. Mr. Pickett believed that with the right brand and promotion, Lyft could, at the same time, help people and communities in need through the use of its ridesharing platform, and grows its business and brand.

23. Mr. Pickett also envisioned that LyftUp would partner with musicians and other prominent figures to promote the causes, and among other things, raise money to support schools, communities, and relief efforts for natural disasters and other tragedies.

24. During mid-2016 Mr. Pickett created promotional materials in anticipation of presenting his ideas to Lyft, including a proposed logo for LyftUp.

**B.   PICKETT AND LYFT AGREE ON TERMS FOR PICKETT TO DISCLOSE HIS IDEAS TO LYFT.**

25. During the late Summer or early Fall of 2016, Mr. Pickett met Andrew Woolf, the General Manager of Lyft in Pennsylvania at a mixer held at Howl at the Moon in Philadelphia.

26. Without revealing his ideas for LyftUp, Mr. Pickett told Mr. Woolf that he had an idea that he felt would be transformative for Lyft.

27. Mr. Woolf provided Mr. Pickett with contact information for Josh Huber, City Marketing Leader for Lyft.

28. On or around October 7, 2016, Mr. Pickett had a conference call with Mr. Huber.

29. Mr. Pickett made clear that he was only willing to discuss his ideas with Mr. Huber if Lyft would agree that Mr. Pickett owned the ideas, and that Lyft could not use his ideas without Mr. Pickett's consent and a subsequent agreement on compensation.

30. Mr. Huber acknowledged and agreed to Mr. Pickett's terms on behalf of Lyft.

31. Mr. Pickett then explained the ideas for LyftUp in full detail.

32. During a follow-up conversation on December 13, 2016, Mr. Huber stated that he was interested in further exploring Mr. Pickett's LyftUp ideas, but due to other projects asked Mr. Pickett to contact him again in February of 2017.

33. On or around February 7, 2017, Mr. Huber stated that he still was at full capacity and asked that they discuss the idea further at a later time.

34. Mr. Pickett made several attempts to continue the conversations with Mr. Huber, but Mr. Huber stopped responding.

35. In October 2017, Mr. Huber was promoted to Marketing Manager.

36. Because Mr. Huber was not responding, Mr. Pickett sought to connect with others at Lyft to discuss his ideas.

37. On May 8, 2019, Mr. Pickett reached out to Andrew Rubin, Lyft Special Operations, and explained that he had been working on a marketing campaign to help Lyft close the gap with Uber, and that he felt the campaign would be a game changer for Lyft.

38. Mr. Pickett made clear to Mr. Rubin that he was concerned about making sure his ideas were protected before he presented them to Lyft, and that he felt his ideas should be presented in person instead of over email.

39. Mr. Rubin agreed on behalf of Lyft that the ideas presented would be treated as confidential and that Lyft would not use Mr. Pickett's ideas without his permission and an agreement on compensation.

40. On May 21, 2019, Mr. Pickett met with Mr. Rubin at Lyft's Philadelphia South Street headquarters.

41. Mr. Pickett made clear that he was presenting the ideas with the expectation that Lyft would not use the ideas without his agreement and involvement, and without an agreement on compensation to him.

42. Mr. Rubin, on behalf of Lyft, acknowledged and agreed to Mr. Pickett's terms.

43. Based on the representations by Mr. Rubin, Mr. Pickett presented the LyftUp ideas to him in full.

44. On May 22, 2019, Mr. Pickett emailed Mr. Rubin other information to be passed along to the internal Lyft marketing team.

45. On May 28, 2019, the LyftUp concept was reviewed by Hannah Marks, the leader of the Philadelphia marketing team.

46. On May 29, 2019, the LyftUp Philadelphia marketing team requested that Mr. Pickett send to them a promotional video Mr. Pickett had created for their review and consideration.

47. On June 19, 2019, Mr. Pickett attended a meeting with Hannah Marks about LyftUp in the office of the Pennsylvania General Manager, Andrew Woolf, at the Philadelphia South Street headquarters.

48. During that June 19, 2019, meeting Mr. Pickett again explained the LyftUp ideas he had created and touched on different ways LyftUp could help communities worldwide and promote its ride sharing business.

49. Ms. Marks stated that an idea of the magnitude presented by Mr. Pickett would need to be launched from a national level and that she wanted to talk over the idea with her marketing team.

50. Ms. Marks told Mr. Pickett she would be in touch with him about the logistics of moving forward with the LyftUp idea.

51. Based on Ms. Marks statement that the program would need to be launched on a national level, on June 26, 2019, Mr. Pickett reach out to Dolly Dogiparthy, Technical Program Manager for Lyft Corporate in San Francisco, CA about the LyftUp idea.

52. Ms. Dogiparthy referred Mr. Pickett to Anika Shah, Product Marketing Manager, who then referred Mr. Pickett to Alex Chahin and Krutika Dave, Rider Marketing Team representatives.

53. On January 23, 2020, having heard nothing about the status of his LyftUp program idea, Mr. Pickett reached out directly to Ellen Black, Lead Producer at Lyft headquarters. While Mr. Pickett did not provide Ms. Black with the details of his ideas, he explained that he was looking to connect with someone in marketing at headquarters.

54. Ms. Black responded to Mr. Pickett that she had "heard back from one of the leads on the Marketing team and he said that someone will reach out to you. He let me know it probably isn't going to be for a couple weeks because they are swamped right now."

55. Lyft's Marketing team never followed up with Mr. Pickett as promised.

C. **LYFT BREACHES THE AGREEMENT AND USES MR. PICKETT'S LYFTUP IDEAS WITHOUT PERMISSION OR COMPENSATION.**

56. Unbeknownst to Mr. Pickett at the time of his January 23, 2020 communications with Ellen Black, two days prior, on January 21, 2020, Lyft had gone public with an announcement regarding the LyftUp bikeshare program at the New York City Harlem YMCA with basketball star Lebron James and professional BMX athlete and filmmaker Nigel Sylvestor attending.

57. Lyft's share price rose over 3.1% on January 21, 2020, the day that Lyft announced the LyftUp bikeshare program with Lebron James. The market as a whole fell by 0.3% on the same day.

58. On February 6, 2020, Lyft promoted the LyftUp program on Instagram via a 4 ½ minute promotional video featuring Alicia Keys where she posed as an undercover Lyft driver.

59. Alicia Keys' Instagram post about the LyftUp video had been viewed over 2.3 million times at the time this action was filed.

60. Lyft's YouTube posting of the Alicia Keys video had been viewed approximately 3.5 million times at the time this action was filed.

61. Lyft promoted the Alicia Keys video on the Lyft Blog, stating:

> You don't have to be a Grammy winner to make big wins for your community. Lyft passengers can help a worthy organization of their choice by rounding up and donating their ride payment to the nearest dollar. It's all part of LyftUp: our new initiative to help bring affordable, reliable transportation to those who need it most.
>
> "Undercover Lyft was toooo fun!!! I loved it! such a beautiful experience. Lyft is all about connecting communities, and I loved getting the opportunity to connect with people in such a real and intimate way as a 'driver.' I've never had an experience like this! It lit me up!" [quoting Alicia Keys]

62. Logan Green, Chief Executive Officer, Co-Founder and Director, highlighted LyftUp in an Investor Call on February 22, 2020, stating:

> Finally, before we take questions, I want to briefly reflect on how our work ties back to our mission; improving people's lives with the world's best transportation. Millions of people lack access to reliable, affordable transportation. Our transportation access programs provide free and discounted rides to those who needs the most. This includes our work on disaster response, as well as our efforts on jobs, groceries, and voting access. Just a few weeks ago, we combined all of these programs into a single comprehensive initiative that we're calling LyftUp. We also announced our newest LyftUp program, a partnership with LeBron James and his athlete empowerment company, Uninterrupted, to expand bike share

8

access across the country. We're thrilled with our results in 2019 and the massive opportunity ahead to continue disrupting one of the largest addressable markets in North America.

63. Lyft's 2019 Form 10-K for the fiscal year ended December 31, 2019, released on February 28, 2020, also touted and provided a description of the newly created LyftUp program, stating:

**Values and Culture**

Building community and having a positive local impact is fundamental to who we are. We approach working with our partners, cities and municipalities in a collaborative manner and seek to establish mutually beneficial relationships based on trust, respect and a common objective of improving people's lives by improving transportation.

Millions of people lack access to basic needs because they can't get a ride. Through our LyftUp initiative, we're working to make sure everyone has access to affordable, reliable transportation to get where they need to go — no matter their age, income, or zip code.

This vision has been core to our business from the start. We believe more than 40% of Lyft rides start or end in low-income areas. In a number of cities,

our riders can now find public transit, shared rides, bikes, and scooters all in the same app. Every day, Lyft helps unlock access for millions of people — providing a crucial entry point for upward mobility.

We built LyftUp to account for those still left behind. LyftUp aims to bridge some of the most serious outstanding transportation gaps. Through LyftUp, we partner with leading nonprofit organizations to provide free and discounted car, bike, and scooter rides to individuals and families in need.

Our five primary programs are:
- Grocery Access - rides to/from the grocery store for families living in areas without sufficient grocery store access;
- Jobs Access - rides to/from job interviews, job trainings, and the first few weeks of a new job;

- Voting Access - free and discounted rides to the polls;
- Disaster Response - rides to access vital services leading up to and in the wake of disasters and other local emergencies; and
- Bikeshare Access - discounted bikeshare memberships for eligible applicants who qualify for federal/state/local assistance programs, and free passes to thousands of young people ages 16 to 20 years old.

64. The LyftUp program has been highlighted by, among others, dozens of other social media posts, main-stream and alternative news articles, and television news stories.

65. The significant value of Mr. Pickett's ideas is clear from the fact that the LyftUp program was specifically discussed by Lyft's CEO on an Investor Call, was highlighted in Lyft's Annual Form 10-K, and has been promoted through, among other ways, partnerships with two of the world's highest value celebrities – Lebron James and Alicia Keys.

66. Not only did the LyftUp program Lyft promoted bear the exact same name as that proposed by Mr. Pickett, but it also had the same purpose as that proposed by Mr. Pickett, and incredibly, even used a logo strikingly similar to the one designed by Mr. Pickett.

67. The LyftUp logo used by Lyft on its website is:



68. The Logo that Mr. Pickett confidentially presented to Lyft is substantially similar:



69. Lyft's only changes to the logo Mr. Pickett proposed were to flip flop the colors used in the words, and to use a different font for the "Up" portion of the logo.

70. Lyft's egregious misrepresentations to induce Mr. Pickett to reveal his ideas, and Lyft's subsequent breaches of its agreement with Mr. Pickett, are counter to Lyft's public claims as a company built on "values and culture."

71. Mr. Pickett has been damaged by Lyft's misrepresentations and breaches.

72. As such, Defendant Lyft should be required to stop using the LyftUp name and also be forced to compensate Mr. Pickett for the value of the confidential ideas that Lyft used without permission or compensation in breach of their agreement.

## CAUSES OF ACTION

### COUNT I
### (FRAUD)

73. Mr. Pickett repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

74. Mr. Huber, Mr. Rubin and Ms. Marks misrepresented that: (1) Lyft would keep Mr. Pickett's ideas confidential, (2) Lyft would not use Mr. Pickett's ideas without his consent, and (3) if Lyft chose to use Mr. Pickett's ideas, Lyft would compensate Mr. Pickett for Lyft's use of those ideas.

75. Lyft's misrepresentations were material to Mr. Pickett's decision to disclose his ideas.

76. Without those misrepresentations having been made, Mr. Pickett would not have disclosed his ideas to Lyft.

77. The misrepresentations made by Mr. Huber, Mr. Rubin and Ms. Marks were made with the specific intent to mislead Mr. Pickett into relying on those representations to induce him to reveal his ideas to Lyft.

78. Mr. Pickett was justified in relying on those misrepresentations given the positions that Mr. Huber, Mr. Rubin and Ms. Marks held within Lyft.

79. Mr. Pickett relied to his detriment on Lyft's misrepresentations, having suffered damages as a result of Lyft's use of his ideas without his permission and without giving him any acknowledgment, and Lyft's use of his ideas without providing him any compensation.

## COUNT II
### (BREACH OF CONTRACT)

80. Mr. Pickett repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

81. Mr. Pickett and Lyft reached an agreement that Mr. Pickett would disclose his ideas only if Lyft agreed: (a) to keep his ideas confidential; (b) to not use his ideas without his consent; and (c) to not use his ideas without an agreement on compensation.

82. Based on that agreement, Mr. Pickett disclosed his ideas to Lyft.

83. Lyft did not keep Mr. Pickett's ideas confidential and instead have used them and promoted them to the world as an initiative it created.

84. Lyft did not obtain Mr. Pickett's consent to use the LyftUp name or his other ideas.

85. In violation of its agreement not to use Mr. Pickett's ideas unless he and Lyft agreed on compensation for the ideas, Lyft used the ideas without entering into a compensation agreement with Mr. Pickett.

86. In addition, Lyft's conduct is a breach of the implied covenant of good faith and fair dealing.

87. Mr. Pickett has been damaged as a result of Lyft's actions.

88. Lyft should be enjoined from continuing to use the name LyftUp in violation of the agreement between Lyft and Mr. Pickett.

89. Lyft also should be forced to compensate Mr. Pickett for his damage.

## COUNT III
## (PROMISSORY ESTOPPEL)

90. Mr. Pickett repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

91. Mr. Pickett pleads this claim of promissory estoppel in the alternative to the extent that Lyft disputes the existence, validity or enforceability of the contract between Mr. Pickett and Lyft as described above.

92. Mr. Huber, Mr. Rubin and Ms. Marks promised that: (1) Lyft would keep M. Pickett's ideas confidential, (2) Lyft would not use Mr. Pickett's ideas without his consent, and (3) if Lyft chose to use Mr. Pickett's ideas, Lyft would compensate Mr. Pickett for Lyft's use of those ideas.

93. The promises made by Mr. Huber, Mr. Rubin and Ms. Marks induced Mr. Pickett to reveal his ideas to Lyft.

94. Mr. Pickett was justified in relying on those misrepresentations given the positions that Mr. Huber, Mr. Rubin and Ms. Marks held within Lyft.

95. Mr. Pickett relied to his detriment on Lyft's misrepresentations, having suffered damages as a result of Lyft's use of his ideas without his permission and without giving him any acknowledgment, and Lyft's use of his ideas without providing him any compensation.

## COUNT IV
## (UNJUST ENRICHMENT)

96. Mr. Pickett repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

97. Mr. Pickett pleads this claim of unjust enrichment in the alternative to the extent that Lyft disputes the existence, validity or enforceability of the contract between Mr. Pickett and Lyft as described above.

98. A benefit was conferred on Lyft by Mr. Pickett when he shared his ideas with Lyft.

99. Lyft appreciated and understood the benefit of Mr. Pickett's ideas to Lyft's business as evidenced by, among other things, the public statements by Lyft, its executives, and the high-level celebrities, like Lebron James and Alicia Keys, that Lyft has engaged to help it promote the LyftUp initiative.

100. Lyft's acceptance and use of Mr. Pickett's ideas without any compensation make it inequitable for Lyft to retain the benefit without paying for the value of the benefit.

101. Mr. Pickett has been damaged as a result of Lyft's actions.

102. Lyft should be forced to compensate Mr. Prickett for that damage.

## JURY DEMAND

Plaintiff demands trial by jury on all counts for which a jury trial is permitted.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Permanently enjoin Defendant from continuing to use the name LyftUp in breach of its contract;

B. Award Plaintiff damages to be determined at trial;

    C.  Award Plaintiff prejudgment and post judgment interest;

    D.  Award Plaintiff punitive damages; and,

    E.  Award such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Jeffery A. Dailey*
Jeffery A. Dailey (No. 85993)
Gay Parks Rainville (No. 53192)
Alfred Anthony Brown (No. 59403)
DAILEY LLP
1650 Market Street
36th Floor
Philadelphia, PA  19103
(215) 367-1640

Attorneys for Plaintiff
Marcus Pickett

Dated:  December 21, 2020