**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARCUS PICKETT, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 20-6389 |
| LYFT, INC., | |
| *Defendant.* | |

**PAPPERT, J.**                                                    **May 16, 2022**

<u>**MEMORANDUM**</u>

Marcus Pickett claims he devised a marketing concept that would transform Lyft Inc.'s promotion of its ridesharing business and engagement with communities in need. Pickett pitched his idea, which he called "LyftUp,"[1] to a Lyft marketing employee in the fall of 2016 but did not discuss it with anyone else at Lyft for more than two years. In the spring of 2019, Pickett joined Lyft's Philadelphia driver advisory council and, as part of that process, signed a consulting agreement containing arbitration provisions. He then presented his idea to the council's leader and multiple other Lyft representatives; in doing so, he repeatedly used his council membership to tout LyftUp.

Pickett now asserts Lyft implemented his idea without crediting (or paying) him. He sued Lyft for fraud, breach of contract, promissory estoppel and unjust enrichment, and his case was assigned to Judge Joyner. Lyft moved to stay the litigation and compel arbitration. After finding it "patently unclear" whether Pickett's claims fell within the consulting agreement's arbitration provisions, Judge Joyner stayed Lyft's

---

[1]     In this Memorandum, "LyftUp" refers to Pickett's alleged concept rather than the initiative Lyft launched in January of 2020. *See infra* n.3 and accompanying text.

motion for ninety days while the parties engaged in discovery regarding the arbitrability of Pickett's claims.  He also permitted them to submit supplemental briefing and evidence after the ninety-day period.  The case was subsequently reassigned to this Court, and the parties then filed their supplemental materials.  The Court can now decide Lyft's motion under the summary judgment standard.[2]

Pickett makes overlapping and unspecific arguments as to why his claims are not subject to arbitration.  He essentially contends there was no mutual assent to the consulting agreement or its arbitration or delegation provisions and that disputes over his LyftUp concept are not subject to arbitration.  Having considered the parties' arguments and reviewed their submissions, the Court grants Lyft's motion and stays the case pending arbitration.  Pickett and Lyft clearly delegated arbitrability questions to an arbitrator.  Even if the agreement's delegation clause was not enforceable, the Court would compel arbitration because the parties agreed to arbitrate and the agreement's terms encompass disputes over LyftUp.

## I

## A

Pickett is an entrepreneur and musician who started driving for Lyft in 2016. (Compl. ¶ 16, ECF 1; Pickett Dep. 11:25–12:3, Pl. & Def. Ex. 1, ECF 23-2, 24-2.)  On

---

[2]     A district court deciding a motion to compel arbitration applies the standard for motions to dismiss under Federal Rule of Civil Procedure 12(b)(6)—without allowing discovery—when arbitrability is "apparent on the face of the complaint."  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 773–74 (3d Cir. 2013) (internal quotation marks omitted).  If the complaint is "unclear" about whether the parties agreed to arbitrate or the plaintiff responds to the motion with "additional facts sufficient to place the agreement to arbitrate in issue," however, the parties are entitled to "limited" discovery on arbitrability.  *Id.* at 774–76.  Here, Judge Joyner ordered such discovery, so the Court considers the "renewed motion to compel arbitration" under the summary judgment standard, where the question is whether there is a "genuine dispute as to the enforceability of the arbitration" agreement.  *Id.* at 776.

October 7 of that year, Pickett presented LyftUp over the telephone to Lyft City Marketing Leader Josh Huber.  (Pickett Dep. 25:9–26:1; Pl.'s Statement of Undisputed Facts (SUF) ¶ 3, ECF 24-1.)  According to Pickett, Huber thought it was an "excellent idea that he wanted to move forward with."  (Pickett Dep. 32:16–18.)

Pickett spoke again with Huber about two months later, but when Pickett emailed Huber the following February, Huber replied that he was "at full capacity" and then stopped responding to Pickett.  (Pickett Dep. 26:3–21.)  According to Pickett, however, at that point Huber "had all the information he needed" for Pickett's concept.  (*Id.* at 27:4–7)  While Pickett said his discussions with Huber were part of an "ongoing relationship and conversation with Lyft that never formally ended," he did not discuss his idea with anyone at Lyft for more than two years after his exchange with Huber.  (*Id.* at 23:3–7, 32:21–33:2); *see infra* subsection I.C.1.

## B

### 1

In May of 2019, Pickett joined Lyft's Philadelphia Local Driver Advisory Council, which brings "grassroots driver feedback directly to Lyft" and helps it "make better business decisions that improve the driver experience."  (LDAC Webpage, Def. Ex. 2, ECF 23-3); *see also* (LDAC Welcome Email, Pl. Ex. 3, ECF 24-4 (describing roles of LDAC member-drivers, including "local ambassador")).  Pickett, who viewed the LDAC as "another notch in my resume" with Lyft, thought it wanted his perspective on issues "in the scope of all drivers" and "ways to improve" the driver and passenger experience.  (*Id.* at 41:25–42:8, 54:15–22.)

When applying to the LDAC, Pickett believed it had "absolutely nothing to do with an idea that I had already presented to Lyft." (*Id.* at 57:25–58:3.)  He assumed "it was known" LyftUp was "completely separate" even though he told no one at Lyft about it, only vaguely noting on his application that he worked with Huber on a "creative idea" for Lyft. (*Id.* at 72:19–25, 84:8–85:3, 119:2–20.)  In Pickett's view, "common sense" meant this idea was separate from the LDAC because it "already happened" before he applied. (*Id.* at 130:19–24.)  Meanwhile, Pickett thought Lyft was still considering the LyftUp concept he pitched two-and-a-half years earlier and that his "name must be circulating" inside the company because it selected him for the LDAC. (*Id.* at 120:17–21.)

Pickett learned he was chosen for the LDAC in a May 1, 2019, email to members with the subject line "Welcome to Lyft's Local Driver Advisory Council." (LDAC Welcome Email.)  The email said Pickett needed to review and sign a consulting agreement, which Lyft referred to as the "Lyft LDAC Consulting Agreement" and the "Local Driver Advisory Council Philadelphia 2019 Consulting Agreement." (*Id.*; Pickett Signature Email, Pl. Ex. 5, ECF 24-6; Neha Ajmera Signature Email, Pl. Ex. 6, ECF 24-7.)  Pickett read the Consulting Agreement and signed it two days after receiving the welcome email. (Consulting Agreement Audit, Pl. Ex. 7, ECF 24-8; Pickett Dep. 101:10–12.)

2

Under the Consulting Agreement, Pickett—during a renewable, six-month term, in exchange for a $250 monthly fee—was to provide consulting "Services" listed in the "Project Description," including offering "productive feedback and ideas" from Pickett's

"local driver market" and consulting about "early-stage projects." (Def. Ex. 5 §§ 1(a),

(c)–(d), Ex. A, ECF 23-6.)  Paragraph 8 of the Consulting Agreement constituted the

parties' "Agreement to Arbitrate" and included the following provisions most relevant to

Lyft's Motion:

> Consultant and the Company agree that any and all claims, disputes or controversies between Consultant and the Company arising out of or relating in any way to this Agreement (including its enforcement, breach, performance, interpretation, validity, or termination), including any claims arising out of or related in any way to Consultant's relationship with or Services for the Company and/or its affiliates, shall be submitted to final and binding arbitration to the fullest extent allowed by law.  This arbitration obligation shall apply to any and all claims, causes of action, in law or equity of any nature whatsoever, whether arising in contract, tort or statute, between Consultant and the Company and/or their affiliated entities (including their owners, directors, managers, employees, agents, and officers), unless the particular dispute or claim is expressly exempted from arbitration in Section [8(d)].  **By agreeing to this dispute resolution and arbitration agreement, Consultant and the Company expressly waive the right to sue in court and have a jury or judge decide their claim, dispute, or controversy.**

(*Id.* at § 8(a) (emphasis in original).)

> Consultant and the Company expressly delegate to the arbitrator the authority to determine the arbitrability of any dispute, including the scope, applicability, validity, and enforceability of this arbitration provision.

 (*Id.* at § 8(c).)

The Consulting Agreement, which is fully integrated, was effective on May 3,

2019, when Pickett signed it, but a Lyft representative did not sign it until May 14, the

agreed-on date for the Project Description.  (*Id.* at § 9(f), Ex. A; Weemes Decl. ¶ 3, Pl.

Ex. 11, ECF 24-12.)

At that time, Pickett considered the Consulting Agreement the "next step of me

signing up for" the LDAC, thought it "pretty clearcut" that it applied only to LDAC

activities and understood that only LDAC-related disputes would be arbitrated.  *See*

(Pickett Dep. 97:5–21, 102:8–17, 110:23–25, 132:8–25).  No one at Lyft ever told Pickett that the Consulting Agreement did not encompass matters other than LDAC activities. (*Id.* at 198:10–14.)

C

1

Soon after Pickett signed the Consulting Agreement, Philadelphia LDAC leader Andrew Rubin contacted him about scheduling the council's first meeting.  (Pickett Dep. 144:16–145:10.)  Pickett texted Rubin on May 8 stating he wanted to present an idea for a Lyft marketing campaign.  (May 8, 2019 Andrew Rubin Texts, Def. Ex. 6, ECF 23-7.)  Rubin suggested they discuss his concept at the first LDAC meeting planned for late May, but Pickett asked if instead he could pitch it to Rubin in a separate meeting between them.  (*Id.*)  While noting his idea "doesn't have anything to do with" the LDAC and is "more so me being very passionate and motivated to help the company and others," Pickett told Rubin that if Rubin could not meet with him privately, Pickett would "wait until the [LDAC] meeting" to discuss his idea.  (*Id.*) Rubin responded, "Sounds great!," and suggested they meet for coffee the following week.  (*Id.*)

Pickett interpreted Rubin's response to mean he "agreed" Pickett's idea was unrelated to the LDAC, but Rubin never said such a thing.  (Pickett Dep. 153:12–154:12.)  Pickett ultimately presented his idea to Rubin on May 21, 2019.  (Compl. ¶ 40, 43.)  He later explained that the "basis and foundation" of the idea he discussed with Rubin were "very similar" to the one he discussed with Huber in 2016—but was

uncomfortable saying whether they were the same concepts.  (Pickett Dep. 150:12–23.)
Pickett and Rubin never discussed the Consulting Agreement.  (*Id.* at 156:25–157:12.)

2

After Pickett texted with Rubin on May 8, 2019, Pickett met several times with
Lyft representatives about LyftUp and "clarified" to them that it was separate from the
LDAC.  (Pickett Dep. 158:2–8, 165:25–166:6.)  One meeting was on June 19 with
Marketing Manager Hannah Marks, who told Pickett his concept "needed to be a
national idea."  (*Id.* at 166:10–12, 190:11–23; Pickett Decl. ¶ 14, ECF 24-3.)

Pickett subsequently emailed several other Lyft employees about LyftUp.
(Dogiparthy Emails, Def. Ex. 8, ECF 23-9; Anika Shah Email, Def. Ex. 9, ECF 23-10;
Alex Chahin Email, Def. Ex. 10, ECF 23-11; Weemes Email, Def. Ex. 12, ECF 23-13;
Black Emails, Def. Ex. 3, ECF 23-4.)  They included Driver Advocacy Community Lead
Marcus Weemes, a LDAC contact who ensured members signed the Consulting
Agreement.  *See* (Weemes Dep. 24:4–9, Pl. Ex. 4, ECF 24-5; Pl.'s SUF ¶ 45).

Pickett mentioned his LDAC membership or included his LDAC email address in
these messages to distinguish himself from a "random person reaching out" and prove
he was "legit" and being truthful.  (Pickett Dep. 165:10–15, 172:2–16); *e.g.*, (Def. Ex. 8
(first sentence of email to Technical Program Manager Dolly Dogiparthy states "I'm
part of the Philadelphia DAC")).

Further, in January of 2020, Pickett explained to Lead Producer Ellen Black
that he applied for the LDAC to "get more involved so that when the time was right I
would have the trust to be taken seriously" over LyftUp.  *See* (Def. Ex. 3).  He also told
Black he "discovered" his concept in part while serving as a "local ambassador" for Lyft,

7

an LDAC duty.  (*Id.*; Welcome Email 239.)  Pickett later said that by joining the LDAC he "added to [his] resume" to "speed up the process" of Lyft moving forward with his idea.  (Pickett Dep. 175:4–13); *see also* (Pl.'s Interrogs. Resps. 2 (stating he joined the LDAC "because it seemed like a cool opportunity to learn more about" Lyft)).  He also suggested in these messages, however, that LyftUp was separate from his LDAC work. *See, e.g.*, (Def. Ex. 8 (telling Dogiparthy he had been working on his idea "[a]side from the DAC")).

D

On January 7, 2020, Pickett renewed his LDAC membership by signing a consulting agreement (with arbitration provisions) similar to the May 2019 agreement. (Jan. 2020 Consulting Agreement, Def. Ex. 11, ECF 23-12.)  He continued to believe then that his LDAC work was separate from LyftUp.  (Pickett Dep. 182:14–18.)  In fact, according to Pickett, he made this separation "very clear" throughout his LDAC stint and "never discussed" his concept "during the [LDAC] meetings or to the [LDAC] members."  (*Id.* at 180:4–9, 186:13–15.)

On January 21, Lyft publicly announced a national program called LyftUp.[3] (Compl. ¶ 56.)  About three months later, Pickett signed another similar consulting agreement (with arbitration provisions).  (Apr. 2020 Consulting Agreement, Def. Ex. 13, ECF 23-14.)

---

[3]      The parties stipulated that the Philadelphia LDAC was "not involved" with this initiative. (Weemes Dep. 5:21–6:4.)

## II

### A

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it may affect the case's outcome "under the governing law," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere "scintilla" of evidence supporting the nonmoving party will not suffice; to avoid summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial" and cannot "rest upon" pleadings. *Id.* at 252, 256. These facts must enable it to "make a sufficient showing on essential elements" of its case on which it bears the burden of proof. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

On summary judgment, a court can consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). While the court must "view the facts in the light most favorable to the nonmoving party and draw all inferences" in its favor, it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (internal quotation marks omitted); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Additionally, the court may not make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

### B

The Federal Arbitration Act responded to "widespread judicial hostility to arbitration agreements" and codified a "liberal federal policy favoring arbitration."

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Because "arbitration is a matter of contract," courts must "place arbitration agreements on an equal footing with other contracts" and "rigorously enforce" their terms.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *AT&T Mobility*, 563 U.S. at 339 (citation omitted); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (internal quotation marks omitted).

A written provision in a contract "evidencing a transaction involving commerce"—such as a consulting contract—"to settle by arbitration a controversy thereafter arising out of such contract" is "valid, irrevocable, and enforceable" except on "such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  If any suit is brought in a federal district court on an issue referable to arbitration under an arbitration agreement, the court, once "satisfied" the issue is so referable, "shall on application of one of the parties stay the trial of the action" until arbitration has proceeded pursuant to the agreement.  § 3.  And any party aggrieved by another's refusal to arbitrate under an arbitration agreement can petition a district court for an order compelling arbitration, and the court "shall" grant it unless the "making of" the arbitration agreement is in issue.  § 4.  Consequently, the FAA "leaves no place for the exercise of discretion" with respect to enforcing arbitration agreements for covered issues.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

III

A

A delegation clause is an agreement to arbitrate questions about whether the parties are "bound by an agreement to arbitrate." *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019). "Gateway" arbitrability issues include "whether the parties have agreed to arbitrate" and "whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (internal quotation marks omitted). An agreement to arbitrate a gateway question is "simply an additional, antecedent [arbitration] agreement the party seeking arbitration asks the federal court to enforce," and the FAA treats it like other such agreements. *Rent-A-Center*, 561 U.S. at 70.

A court, however, "should not assume" an agreement to arbitrate arbitrability without "clea[r] and unmistakabl[e]" evidence. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If such evidence exists, the court cannot decide gateway questions "unless a party challenge[s] the delegation clause [specifically]" and the court determines it is not enforceable. *Singh*, 939 F.3d at 215 (internal quotation marks omitted); *see also New Prime Inc. v. Oliviera*, 139 S. Ct. 532, 538 (2019) (like with arbitration agreements, a challenge to a delegation clause's validity is treated "separately from a challenge to the validity of the entire contract in which it appears").

To specifically contest a delegation clause, a party "must at least reference" the delegation clause when opposing a motion to compel arbitration and cannot merely challenge an arbitration agreement's validity "as a whole." *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018). But it can use the "same arguments that it

employs to contest the enforceability of other arbitration agreement provisions." *Id.* at 226–27.  Absent a specific challenge, the FAA requires courts to consider the delegation clause "valid" and enforce it.  *Rent-A-Center*, 561 U.S. at 72.

## B

Pickett and Lyft clearly and unmistakably agreed to arbitrate arbitrability questions through the Consulting Agreement's delegation clause.  *See First Options*, 514 U.S. at 944; (Def. Ex. 5 § 8(c)).  Pickett, however, challenges this provision specifically by referencing it several times.  *See Singh*, 939 F.3d at 215; *e.g.*, (Pickett's Supp. Brief in Opp. to Mot. to Compel & Stay 1, ECF 24 (arguing the Consulting Agreement's "delegation provisions" are invalid with respect to Pickett's claims)).  Pickett's challenge to the delegation clause relies on the same argument—a lack of mutual assent—he uses to contest the entire arbitration agreement.  *See MacDonald*, 883 F.3d at 226–27.  The clause, however, is enforceable because Pickett's challenge fails for reasons stated in subsection IV.A.3.

## IV

The Court would compel arbitration even if the delegation clause were unenforceable.  To do so, it must find (1) "there is an agreement to arbitrate" and (2) the dispute falls within its scope.  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009).  Pickett disputes both elements.

### A

#### 1

Because parties can "exclude[e] certain claims" from their arbitration agreement's scope, a court must find they have "agreed to arbitrate the dispute in

issue." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989); *Century Indemnity*, 584 F.3d at 523 (emphasis in original).

"[O]rdinary state-law principles" governing contract formation determine an arbitration agreement's validity. *James v. Global TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *First Options*, 514 U.S. at 944). Under Pennsylvania law, courts give "paramount importance to the intent of the parties and ascribe[] [to them] the most reasonable, probable, and natural conduct." *Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 287 (Pa. Super. Ct. 2005) (internal quotation marks omitted).

Contract formation requires "mutual assent." *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 136 (Pa. 1999). Whether mutual assent exists turns on a reasonable person's understanding of the parties' intent "given their objective manifestations." *Ryan v. Temple Univ.*, 535 F. Supp. 3d 356, 364–65 (E.D. Pa. 2021). "[U]ndisclosed and subjective intentions" are irrelevant. *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. Ct. 1999) (internal quotation marks omitted); *see also Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482 (Pa. Sup. Ct. 1984) ("true and actual meeting of the minds" is unnecessary).

2

To avoid arbitration, a party must challenge the "arbitration clause itself" rather than the contract containing it. *MZM Constr. Co. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)); *S. Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 143 (3d Cir. 2016) (challenge must "focus exclusively on the arbitration provision"). Issues pertaining to the entire

contract's validity are reserved for arbitration.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–45 (2006).

But the FAA "affirmatively requires" a court to decide questions about an arbitration agreement's formation or existence, "namely the element of mutual assent" to the container contract.  *MZM Construction*, 974 F.3d at 397–98, 398 n.7.  A party can also challenge the "arbitration clause itself."  *See Buckeye Check Cashing*, 546 U.S. at 444–45 (internal quotation marks omitted).

3

Pickett argues he did not agree to arbitrate his claims because there was no mutual assent that the Consulting Agreement—or its arbitration or delegation provisions—applied to LyftUp for two reasons.  First, he was defrauded into signing the Agreement.  (Pickett's Supp. Brief in Opp. to Mot to Compel & Stay 9–11.)  Second, Lyft knew he was unilaterally mistaken about the Agreement's scope but said nothing.  (*Id.* at 11.)

i

Pennsylvania law recognizes fraud in either the "execution" or "inducement" of a contract.  *Blumenstock v. Gibson*, 811 A.2d 1029, 1036 (Pa. 2002).  As a general matter, the former causes a party to "believe the nature of his act is something entirely different than it actually is," while the latter "induces a party to "assent to something he otherwise would not have."  *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 490 (3d Cir. 1994) (internal quotation marks omitted).

Fraud in the execution "procures a party's signature" to a contract "without [his] knowledge of its true nature or contents."  *FDIC v. Deglau*, 207 F.3d 153, 171 (3d Cir.

14

2000) (internal quotation marks omitted).  "[I]mportant" contractual terms are "altered or omitted."  *O'Kinsky v. Perone*, No. 10-6075, 2012 WL 1392367, at *3 (E.D. Pa. Apr. 20, 2012).  The defrauded party must show he signed a contract "radically different" from the one he thought he was signing and "excusable ignorance" of its contents, which "typically involves some sort of misconduct or imposition that cuts off the signer's opportunity to read."  *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505–06 (3d Cir. 1992) (internal quotation marks omitted); *MZM Construction*, 974 F.3d at 404.  If the defrauded party succeeds, mutual assent is negated, and courts consider the contract "void and legally ineffective."  *MZM Construction*, 974 F.3d at 405; *Giannone v. Ayne Inst.*, 290 F. Supp. 2d 553, 561 (E.D. Pa. 2003).

By contrast, fraud in the inducement involves alleged oral representations a party relied on when "entering into" the contract "but which are contrary to" its express terms.  *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1300 (3d Cir. 1996); *see also Creative Waste Mgmt., Inc. v. Capitol Env't'l Servs., Inc.*, No. 04-1060, 2004 WL 2384991, at *4 n.4 (E.D. Pa. Oct. 22, 2004) (fraudulent inducement's gravamen is a "false representation made to the injured party *before* the disputed transaction, but for which, the party would not have agreed" to it (emphasis in original)); *McCann v. Neuronetics, Inc.*, No. 21-1132, 2021 WL 5441094, at *2 (E.D. Pa. Nov. 19, 2021) ("material misrepresentations" that cause a party to interpret contractual terms "in a particular way" constitute fraud in the inducement).

To prove fraudulent inducement, the defrauded party must show the counterparty made a material misrepresentation "falsely, with knowledge of its falsity or recklessness as to whether it is true or false" and with the "intent of misleading

15

another into relying on it," justifiable reliance and proximate cause. *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 256–57 (3d Cir. 2013) (quoting *EBC, Inc. v. Clark Bldg. Sys.*, 618 F.3d 253, 275 (3d Cir. 2010)).  If he can do so, the contract is voidable by the defrauded party, but not void. *Langley v. FDIC*, 484 U.S. 86, 94 (1987). Failure to highlight contractual language, however, is insufficient. *Central Rsrv. Life Ins. Co. v. Marello*, No. 00-3344, 2000 WL 1474106, at *2 (E.D. Pa. Oct. 4, 2000).  A claim of "fraud in the inducement of the arbitration clause itself" is decided by a court, while a claim of "fraud in the inducement of the contract generally" is reserved for arbitration. *Prima Paint*, 388 U.S. at 403–04.

ii

Pickett alleges he was fraudulently induced into signing the Consulting Agreement, a question for the arbitrator to decide. *See Prima Paint*, 388 U.S. at 403–04.  He asserts Lyft misled him into thinking the Agreement did not apply to LyftUp. His argument relies on Lyft's descriptions of the Agreement, that it was emailed only to LDAC members and his texts with Rubin, among other evidence. *See* (Pickett's Supp. Brief in Opp. to Mot to Compel & Stay 2–3, 9–11); *Dayhoff*, 86 F.3d at 1300.  Pickett claims these representations made him construe the Agreement more narrowly than its explicit provisions. *See McCann*, 2021 WL 5441094, at *2.

The most logical interpretation of Pickett's allegations is that he was fraudulently induced into signing the Consulting Agreement.  But if the Court construes his allegations as fraud in the inducement of the arbitration agreement or fraud in the execution of the Consulting Agreement, they are for the Court—rather than the arbitrator—to resolve. *See* 9 U.S.C. § 4.  To the extent either of these

16

interpretations is plausible, Pickett's arguments do not establish a genuine issue as to the arbitration agreement's enforceability. *See Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013).

iii

Pickett cannot show he was fraudulently induced into agreeing to arbitrate his claims against Lyft. As an initial matter, parol evidence is not admissible to prove fraud in the inducement of an integrated contract such as the Consulting Agreement. *See Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 546 (Pa. Sup. Ct. 2005); (Def. Ex. 5 § 9(f)). Even if it were, Pickett relies primarily on Lyft describing the Agreement as an LDAC document. *E.g.*, (Pickett Signature Email (the "Local Driver Advisory Council Philadelphia 2019 Consulting Agreement")). These references do not support Pickett's belief that his LyftUp idea is outside the arbitration agreement's scope. The arbitration agreement covered disputes related to specified "services" Pickett provided as an LDAC member, including offering "feedback and ideas" and consulting on "early-stage projects." (Def. Ex. 5 Ex. A.) LyftUp exemplified both. Pickett is unjustified in interpreting the arbitration agreement more narrowly than its express terms. *See EBC*, 618 F.3d at 275.

Nor did Lyft misrepresent the arbitration agreement's scope by sending the Consulting Agreement to Pickett in a LDAC welcome email, which merely confirmed Pickett was bound by the same document as other members. Lyft need not have highlighted any particular language in the Agreement. *See Central Reserve Life Insurance*, 2000 WL 1474106, at *2.

17

Pickett's May 8, 2019 text exchange with Rubin doesn't help him either.  To start, the conversation—like others with Lyft representatives Pickett relies on—happened after he signed the Consulting Agreement on May 3.  *See Creative Waste Management*, 2004 WL 2384991, at *4 n.4.  In any event, he was unjustified in believing "Sounds great!" meant Rubin agreed Pickett's LyftUp idea was separate from the LDAC.  (May 8, 2019 Andrew Rubin Texts.)  Fairly read, Rubin's response expressed excitement about meeting an enthusiastic member of his new group—not approval of everything in Pickett's long preceding text.  (*Id.*)  Also, that Pickett told Rubin he was open to presenting his idea at the first LDAC meeting vitiates his purported belief that the concept was separate from the council.

None of Lyft's representations to Pickett were made falsely, recklessly or with the intent to mislead, and Pickett was unjustified in relying on them to believe his LyftUp idea fell outside the arbitration agreement.  *See Freeman*, 709 F.3d at 256–57.

iv

Nor does the evidence show Lyft committed fraud in the execution with respect to the Consulting Agreement.  Pickett knew what the Agreement said—he read it before he signed it.  *See FDIC*, 207 F.3d at 171; (Consulting Agreement Audit; Pickett Dep. 101:10–12).  Pickett cannot disavow it, and he has no excuse for his claimed ignorance.  *See MZM Construction*, 974 F.3d at 404; *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008)) (one cannot "enter into a contract, and, when called upon to respond to its obligations," say he "did not know what it contained" (internal quotation marks omitted)).

In arguing there was no mutual assent to the Consulting Agreement, Pickett asserts he didn't believe the Agreement applied to LyftUp.  Whether fraud in the execution negated mutual assent, however, is an objective question of Pickett's and Lyft's intent—not a subjective inquiry into Pickett's musings.  *See Ryan*, 535 F. Supp. 3d at 364–65; *Espenshade*, 729 A.2d at 1243.  It would be irrelevant if there was no actual "meeting of the minds."  *Ingrassia Construction*, 486 A.2d at 482.

Pickett fails to prove important contractual terms were altered or omitted from the Consulting Agreement, or that it was entirely different than he thought.  *See O'Kinsky*, 2012 WL 1392367, at *3; *Connors*, 30 F.3d at 490.  Instead, the Agreement states Lyft wanted LDAC members to share ideas like LyftUp.  *See* (Consulting Agreement Ex. A).

v

A unilateral mistake will void a contract only if the counterparty "knows or has reason to know of" it, and its knowledge justifies inferring "fraud or bad faith." *Harrison v. Fred S. James, P.A., Inc.*, 558 F. Supp. 438, 443 n.3 (E.D. Pa. 1983); *Regions Mortg., Inc. v. Muthler*, 889 A.2d 39, 42 (Pa. 2005) (internal quotation marks omitted). Relief is available when the mistake is due to the "fault of the party not mistaken" rather than the "negligence of the one who acted under the mistake." *Smith v. Thomas Jefferson Univ. Hosp.*, 621 A.2d 1030, 1032 (Pa. Sup. Ct. 1993).

Pickett cannot demonstrate Lyft knew about his mistake or that it acted fraudulently or in bad faith.  *See Harrison*, 558 F. Supp. at 443 n.3; *Regions Mortgage*, 889 A.2d at 42.  The record does not show Lyft was aware of Pickett's mistaken, subjective belief that his LyftUp idea was removed from the Consulting Agreement, or

even that anyone involved with the LDAC or the Agreement knew of Pickett's idea before he signed it.  Pickett did not tell Lyft about LyftUp when applying to the LDAC, and Lyft never told him the Consulting Agreement did not cover non-LDAC activities. (Pickett Dep. 84:8–85:3, 198:10–14.)  Pickett's suggestion to Rubin that his idea was separate from the LDAC did not put Lyft on notice that Pickett misinterpreted the Consulting Agreement's scope.  (May 8, 2019 Andrew Rubin Texts).  He is not entitled to relief based on a mistake for which Lyft is not at fault.  *See Smith*, 621 A.2d at 1032.

B

1

State law governs an arbitration clause's scope "in the first instance." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 522 (3d Cir. 2019).  But given the FAA's presumption of arbitrability, any ambiguity "must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019).  Arbitration should be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation" covering the dispute, and "[d]oubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960)).

This presumption is "particularly strong" for "broad" arbitration clauses, including provisions, like the one in the Consulting Agreement, with the phrase "arising out of or relating to." *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 328 (E.D. Pa. 2004); *Kane v. Advanced Integrated Techs. Grp. Inc.*, No. 07-269, 2007 WL 1237926, at *4 (E.D. Pa. Apr. 25, 2007).  Absent an "express provision excluding a

20

particular grievance from arbitration," it can be avoided only with the "most forceful evidence of a purpose to exclude" the dispute. *AT&T Technologies*, 475 U.S. at 650.

2

Pickett contends his claims do not fall within the parties' arbitration agreement for two reasons. First, the agreement's terms do not encompass LyftUp. (Pickett's Supp. Brief in Opp. to Mot. to Compel & Stay 12–14.) Second, the parties' subsequent conduct confirms the agreement's limited scope. (*Id.* at 15–16.)

i

The arbitration agreement applies to disputes over LyftUp. Its terms are broad, covering "any and all" claims "arising out of or relating in any way to" the Consulting Agreement, including Pickett's "relationship with or Services for" Lyft. (Def. Ex. 5 § 8(b)); *see also Darrington v. Milton Hershey Sch.*, 958 F.3d 188, 195–96 (3d Cir. 2020) (expansively interpreting "any" in an arbitration agreement). Pickett presented his concept while performing those services. *See* (*id.* Ex. A).

The Court need not rely on the presumption of arbitrability. *See Lamps Plus*, 139 S. Ct. at 1418. If there was any doubt about arbitrability, however, it would be resolved in Lyft's favor. *See AT&T Technologies*, 475 U.S. at 650. The presumption is particularly strong for this broad arbitration agreement, and there is no forceful evidence the parties did not intend it to apply to Pickett's idea. *See AT&T Technologies*, 475 U.S. at 650; *Miron, LLP*, 342 F. Supp. 2d at 328.

Pickett's communications with Huber between the fall of 2016 and winter of 2017 are irrelevant. When Pickett began promoting his idea to Lyft representatives after signing the Consulting Agreement, any disputes or controversies over his LyftUp

21

concept became covered by arbitration.  *See* (Def. Ex. 5 § 8(b), Ex. A).  He contends a one-off conversation shields his idea from clearly applicable arbitration provisions he agreed to more than two years later.  This argument is meritless.

In any event, Pickett described his discussions with Huber as part of an "ongoing relationship" with Lyft, a subject the arbitration agreement explicitly covers.  *See* (Pickett Dep. 23:3–7; Def. Ex. 5 § 8(b)).  And though those discussions predated the Consulting Agreement's effective date of May 3, 2019, they are a predecessor to Pickett's consulting "services" of providing feedback and ideas and consulting on early-stage projects.  (Def. Ex. 5 § 8(b).)  Pickett himself acknowledged the concepts he presented to Huber in 2016 and Rubin in 2019 were "very similar."  (Pickett Dep. 149:12–18, 150:12–23.)  Moreover, the arbitration agreement applies retroactively because it contains no express temporal limits.  *See Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267–68 (4th Cir. 2011); *Kristian v. Comcast Corp.*, 446 F.3d 25, 33 (1st Cir. 2006).

ii

Although course of performance is "always relevant" in contract interpretation, courts must "start with the language used by the parties" and cannot "imply a different contract than that which the parties have expressly adopted."  *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978); *E.R. Linde Constr. Corp. v. Goodwin*, 68 A.3d 346, 349 (Pa. Sup. Ct. 2013); *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986).

The arbitration agreement's language controls, and Pickett's idea for LyftUp falls well within it.  *See E.R. Linde Construction*, 68 A.3d at 349.  The parties' conduct

after he signed the Consulting Agreement confirms this.  Lyft never said anything to Pickett that suggested LyftUp was exempt from the arbitration agreement.  While one employee told Pickett his idea needed to be "national," none ever mentioned the Consulting Agreement or its arbitration agreement when discussing the concept with him.

Further, the record refutes Pickett's assertions that he separated LyftUp from the LDAC and, as a result, the arbitration agreement.  Pickett paid lip service to his idea being distinct from the LDAC when communicating with Lyft employees, but he repeatedly used his LDAC role to tout the concept.  When pitching LyftUp, Pickett began by mentioning his LDAC membership and included his LDAC contact information.  *See, e.g.*, (Dolly Dogiparthy Emails; Alex Chahin Email).  He told Lyft representatives he discovered his concept in part while serving as an LDAC "local ambassador," and that he applied for the LDAC to gain the company's trust so it would take the idea seriously.  *See* (Marcus Weemes Email; Ellen Black Emails).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

23